# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| KATIE SMITH, individually and behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NISSAN NORTH AMERICA, INC., <br><br> Defendant. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** <br><br> <u>**CLASS ACTION COMPLAINT**</u> |

Plaintiff Katie Smith ("Plaintiff") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through her attorneys, alleges as follows against Defendant Nissan North America, Inc. ("NNA").

## <u>INTRODUCTION</u>

1.      Because of a defect, the windows on the rear liftgates in 2021-2025 Nissan Rogue vehicles (the "Class Vehicles") are prone to suddenly explode and shatter into thousands of pieces (the "Defect"). This happens without external impact, including when the vehicle is parked, when closing the rear liftgate, or during normal driving. The Defect creates a serious danger for vehicle occupants and others on the road as the windows can shatter into dangerous fragments and create a serious distraction.

2.      NNA has refused to remedy the Defect and routinely denies warranty coverage even when there is no indication of vandalism or impact.

3.      Although NNA is aware of the Defect, it does not disclose the Defect to consumers and continues to sell Class Vehicles subject to the Defect.

4.      Due to the undisclosed Defect, Plaintiff and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles. Plaintiff and Class Members are at risk of their rear windows suddenly exploding, posing a serious safety hazard, requiring costly replacement, and causing diminution of value of their Class Vehicles. Plaintiff accordingly

seeks relief both for herself and for other current and former owners or lessees of these Class Vehicles.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because NNA is headquartered and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, NNA advertised in this district and has received substantial revenue and profits from sales and/or leases of the Class vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

7. This Court has personal jurisdiction over NNA because it is headquartered in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Tennessee and throughout the United States.

## PARTIES

**Plaintiff**

8. Plaintiff Katie Smith is a resident and citizen of Georgia.

9. On or about March 24, 2025, Plaintiff purchased a new 2025 Nissan Rogue from an authorized Nissan dealership.

10. Plaintiff purchased her Class Vehicle for personal, family, or household use.

11.     Safety and reliability were important factors in Plaintiff's decision to purchase the vehicle. Before making her purchase, Plaintiff researched the details about the vehicle by perusing NNA's website and the website hosted by her dealership. She also reviewed the window sticker (the "Monroney" sticker), spoke to a representative of the authorized Nissan dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased. Plaintiff selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. Plaintiff made the purchase in part based on the advertised safety, reliability, and quality of the vehicle and its components.

12.     None of the information provided to Plaintiff disclosed any defects in the rear window. NNA's omissions were material to Plaintiff.

13.     Had NNA disclosed the Defect before Plaintiff purchased her Class Vehicle, she would have seen such disclosures and been aware of them. Indeed, NNA's misstatements and omissions were material to Plaintiff. Like all members of the Class, Plaintiff would have not purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

14.     In addition, at the time Plaintiff purchased her vehicle, and in purchasing her vehicle, she relied upon representations from NNA and its authorized dealership that she saw during her internet research, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, and reliable. Plaintiff relied on those representations and the omission of the disclosure of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

15.     On January 17, 2026, Plaintiff returned to her parked vehicle after finishing her shift at work and found the rear liftgate glass shattered. There was no indication of vandalism or an accident.

16.     The next day, Plaintiff contacted a Nissan dealership and was advised they could inspect the vehicle but that it would not be covered under warranty.

17.     Plaintiff then contacted NNA's Customer Affairs team who confirmed it would not be covered under warranty.

18.     The estimates to replace the rear window are approximately $500.

19.     As a result of the Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless NNA fully discloses the Defect and issues a permanent repair or modification, Plaintiff will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although she would otherwise like to do so.

20.     At all times, Plaintiff, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner that it was intended to be used.

21.     Additionally, as a result of the Defect, Plaintiff has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Defendant**

22.     Defendant Nissan North America, Inc. ("NNA") is a California corporation that is qualified to do, and does, business in the State of Tennessee and in this judicial district. NNA's headquarters is located at One Nissan Way Franklin, Tennessee, 37067.

23.     At all relevant times, NNA is engaged in the business of designing, manufacturing, constructing, assembling, warranting, marketing, advertising, distributing, and selling vehicles and motor vehicle components, including the Class Vehicles, under the "Nissan" brand name in Tennessee and throughout the United States of America.

24.     In order to sell vehicles to the general public, NNA enters into agreements with dealerships who are then authorized to sell Nissan vehicles to consumers such as Plaintiff. In return for the exclusive right to sell new Nissan vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers.  These contracts give Defendant a significant amount of control over the actions of

the dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership is also completed according to NNA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiff can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

25.     NNA develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. NNA is also responsible for the production and content of the information on the Moroney Stickers.

## FACTUAL ALLEGATIONS

26.     The rear windows are the windows on the back of the vehicle on the top of the rear liftgate.

27.     The rear windows in Class Vehicles are made from tempered glass, which is manufactured using heat and various chemicals.

28.     Tempered glass is made by shaping and cutting a piece of annealed glass that is then heated and rapidly cooled. This tempering process creates an outer layer of compression that is shrink-wrapped around the middle of the glass, which is constantly pressing outwards. If the outer layer is compromised, then the entire piece of glass explosively shatters.

29.     Tempered glass is designed to break into little pieces. However, when it fails, it can explode suddenly and completely.

30.     Binding the glass into a frame causes additional stress, particularly as the glass expands and contracts due to temperature changes. This stress can cause so much force that it triggers an explosion when the glass releases its stored energy.

31.     The heat used to create the tempered glass renders it more susceptible to failure than other types of glass.

32.     As part of an ongoing quest to achieve greater fuel efficiency, NNA uses particularly thin tempered glass for the rear windows in Class Vehicles. The thickness of this glass is inadequate, and it makes the glass very prone to suddenly explode or shatter.

33.     Other errors in the manufacturing process can make tempered glass even more susceptible to failure, including inadequate cooling times, uneven distribution of air, poor installation, ill-fitting glass pieces, and points of mechanical contact.

34.     NNA is fully aware of the need to make vehicles with windows that are built to withstand the structural forces encountered while driving. NNA's failure to adequately ensure the rear windows in Class Vehicles are sufficiently durable is the direct cause of the rear window failures experienced by Plaintiff and Class Members.

35.     Indeed, in addition to more robust and better manufactured tempered glass, there are other types of glass that can be used in automobiles, including, for example, laminated glass.

36.     When the rear windows explode, they create a very loud and sudden bang, and glass pieces go flying everywhere. As such, the Defect prevents a safety concern both from the shards of glass and as a potential distraction for drivers.

37.     The rear windows will explode for no reason at all, either while the car is parked, while it is being driven, or while shutting the rear liftgate.

38.     Like Plaintiff, many drivers report no impact or vandalism related to their rear window failures. The glass simply explodes for no apparent reason and with no warning.

39.     When the rear windows in Class Vehicles explode, NNA consistently refuses to cover repairs under its warranty even when the vehicle is within the warranty period. In denying warranty coverage, NNA and its dealers often wrongly and with no evidence claim that the glass must have been hit by something. NNA makes this claim to avoid paying for the repairs even though it knows the rear windows in Class Vehicles are not sufficiently robust and are prone to sudden explosions without any accompanying impact.

40.     Replacement rear windows frequently cost $500 or more.

41.     Because so many rear windows in Class Vehicles are failing, drivers often

encounter difficulty or wait times in even finding replacements. This magnifies the harm caused by the Defect since owners and lessees sometimes have to drive their Class Vehicles without any rear window for days or weeks. This results in an unpleasant driving experience from the noise and exposure to the elements as well as risks additional damage and/or theft of Class Vehicles and their contents.

42.     Owners and lessees further incur additional out-of-pocket expenses in the form of rental cars, alternate transportation, and towing/roadside assistance.

43.     Furthermore, the replacement windows are also subject to the Defect and Plaintiffs and Class Members who pay for a replacement face the likelihood of another failure at any time.

44.     NNA, through its authorized dealerships and service centers, has failed to remedy the Defect.  Until the Defect is fixed by NNA, owners and lessees of Class Vehicles will continue to be at risk of rear window explosions, costly replacements, and frequent dealership visits.

45.     The rear windows in each of the Class Vehicles is the same. Despite extensive knowledge of the Defect from prior model years, NNA continues to put the insufficiently robust tempered glass into new model years.

46.     NNA knew about the Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiff and Class Members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Class Vehicles, NNA has insisted that the vehicles are working as designed.

47.     If Plaintiff and Class Members had known about the Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

48.     As a result of their reliance on NNA's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and they have had to pay out of pocket for repairs.

## NNA Had Superior and Exclusive Knowledge of the Defect

49. NNA was aware of the Defect for years and well before Plaintiff purchased her Class Vehicle in 2025. NNA learned of the Defect through sources such as pre-release evaluation; repair data; replacement part sales data; early consumer complaints made to NNA and/or the National Highway Traffic Safety Administration ("NHTSA"), and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from NNA dealers; as well as through other internal sources unavailable to Plaintiff prior to discovery.

50. While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, NNA would have gained comprehensive and exclusive knowledge about the tempered glass installed in those Vehicles. Adequate pre-release analysis of the design, engineering, and manufacture of Class Vehicles would have revealed to NNA that the design and/or manufacture of the rear windows was defective and susceptible to failure as outlined above.

51. NNA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, NNA conducts tests, including pre-sale durability testing, on incoming components, including glass, to verify the parts are free from defect and align with NNA's specifications.[1]

52. As mentioned above, NNA would have been on notice of the need to ensure the tempered glass in Class Vehicles was sufficiently robust to withstand normal driving conditions. Also, because the rear windows can explode for no reason while the vehicle is parked or in operation, the Defect would have been revealed during general testing and the testing of other parts of the vehicles.

53. Federal law requires automakers like NNA to be in close contact with NHTSA regarding potential auto defects, imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports,

---

[1] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited January 21, 2026).

H0135/4785

customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

54.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles.

55.     Many Class Vehicle owners and lessees submitted complaints about the Defect to NHTSA. This NHTSA complaint database is monitored extensively by NNA.

56.     For example, NHTSA has received at least 45 complaints about rear windshield explosions in the 2023 Nissan Rogue, at least 15 about the 2024 Nissan Rogue, and at least 58 about the 2025 Nissan Rogue.[2] The complaints include incidents that happened when drivers' vehicles were parked, driving slowly, and driving on highways. Furthermore, consumer complaints in NHTSA's database are only a tiny fraction of the actual incidents of exploding rear windshields in Nissan Rogues.

57.     The following complaints are a sampling of the scores of available complaints through NHTSA's website which reveal that NNA, through its network of dealers and repair technicians, was made aware of many rear window failures in Class Vehicles:[3]


August 18, 2025NHTSA CAMPAIGN NUMBER: 11681284
COMPONENT: AIR BAGS, BACK OVER PREVENTION
August 15, 2025NHTSA CAMPAIGN NUMBER: 11680823
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11680823
**Incident Date:** August 7, 2025
**Consumer Location:** ELIZABETH, NJ
**Vehicle Identification Number:** 5N1BT3AA0RC******
**Summary of Complaint**

---

[2] *See* 2024 Nissan Rogue Vehicle Report, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/vehicle/2024/NISSAN/ROGUE/SUV/AWD (last visited Jan. 26, 2026); 2025 Nissan Rogue Vehicle Report, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/vehicle/2025/NISSAN/ROGUE/SUV/AWD (last visited Jan. 26, 2026).

[3] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

**Crash:No Fire:No Injuries:0 Deaths:0**
rear tailgate window exploded for no reason. i work for a fleet company and we have had this happen on at least 8 nissan rogues some in winter some in summer. Glass being blown out is extremely frightening while driving and could increase the risk of a crash. its also a safety issue with glass entering the passenger compartment. This has been reproduced 100s of times. there's plenty of online forums where other rogue owners have experienced the same issue.

September 14, 2025NHTSA CAMPAIGN NUMBER: 11687217
COMPONENT: ELECTRICAL SYSTEM
September 9, 2025NHTSA CAMPAIGN NUMBER: 11685868
COMPONENT: UNKNOWN OR OTHER
**NHTSA ID Number:** 11685868
**Incident Date:** September 9, 2025
**Consumer Location:** SCHENECTADY, NY
**Vehicle Identification Number:** 5N1BT3BB3RC******
**Summary of Complaint**
**Crash:No Fire:No Injuries:0 Deaths:0**
As I was stopped, my rear windshield spontaneously exploded. There were no outside factors, no rocks, no external trauma.

November 12, 2025NHTSA CAMPAIGN NUMBER: 11699013
COMPONENT: UNKNOWN OR OTHER
**NHTSA ID Number:** 11699013
**Incident Date:** October 25, 2025
**Consumer Location:** Unknown
**Vehicle Identification Number:** 5N1BT3BA2RC******
**Summary of Complaint**
**Crash:No Fire:No Injuries:0 Deaths:0**
Vehicle was parked in driveway on a reasonably cool day and the rear hatch window fractured

December 16, 2025NHTSA CAMPAIGN NUMBER: 11705294
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11705294
**Incident Date:** December 16, 2025
**Consumer Location:** PACIFIC, MO
**Vehicle Identification Number:** 5N1BT3BB1RC******
**Summary of Complaint**
**Crash:No Fire:No Injuries:0 Deaths:0**
On 12/16/25 at approximately 6:30am central time, the rear back glass spontaneously shattered while driving to work. The outside temperature was below 30 degrees causing some frost build up. I turned on the rear defrost, and within a few minutes, I heard a loud pop and then a cracking, crumbling like noise and looked back to see the glass was completely shattered.

January 5, 2026NHTSA CAMPAIGN NUMBER: 11708978
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11708978
**Incident Date:** January 5, 2026
**Consumer Location:** ASHFORD, AL
**Vehicle Identification Number:** 5N1BT3AA0RC******
**Summary of Complaint**
**Crash:No Fire:No Injuries:0 Deaths:0**

My wife [XXX] ) was traveling in her 2024 Nissan Rouge at highway speed on her way to work on 1/5/26, in Southeast Alabama, no defroster on, or other car in sight. While traveling her rear windshield randomly busted into a thousand pieces. She immediately notified myself [XXX] ) and the local Sheriffs Office, first believing someone had shot at her car. After deputies arrived and a thorough investigation, revealed that fortunately no one had shot at the car. That it appeared to be a random flaw/defect with the back glass windshield. They also noted that that a similar incident occurred last week mid morning, with a gentleman in a same make and model rouge, as he was traveling, busted without warning. I attempted to call dealership, but they send unbothered and informed me nothing could be done due to no active recall. Upon my own investigation today, I have noted and located many instances of the same occurring in similar models, and even some class actions suits potentially in the works. Please review this with the correct persons and hopefully find some safe resolve. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

January 14, 2026NHTSA CAMPAIGN NUMBER: 11710907
COMPONENT: UNKNOWN OR OTHER, VISIBILITY/WIPER
**NHTSA ID Number:** 11710907
**Incident Date:** January 9, 2026
**Consumer Location:** GRAND RAPIDS, MI
**Vehicle Identification Number:** 5N1BT3BB1RC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
Back window glass spontaneously exploded. there was only a temperature difference of around 20 degrees, nothing crazy and the back window exploded out

January 18, 2026NHTSA CAMPAIGN NUMBER: 11711694
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11711694
**Incident Date:** January 17, 2026
**Consumer Location:** FAIRFIELD, CT
**Vehicle Identification Number:** 5N1BT3BB5RC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
Vehicle parked in driveway. Entire rear window shattered spontaneously. Discovered the damage when I went to drive it again. Simple google search shows it is a known issue with 21-25 model year Nissan Rogues

June 22, 2025NHTSA CAMPAIGN NUMBER: 11668468
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11668468
**Incident Date:** June 21, 2025
**Consumer Location:** NAPLES, ID
**Vehicle Identification Number:** 5N1BT3BB5SC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
Went to leave the house and noticed the rear windshield was shattered. Holes on either side of the windshield. With glass on the outside of the vehicle, as if the windshield had exploded outward.

October 13, 2025NHTSA CAMPAIGN NUMBER: 11693045
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11693045
**Incident Date:** October 10, 2025

**Consumer Location:** GREENVILLE, KY
**Vehicle Identification Number:** 5N1BT3BB2SC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
While parked my rear window imploded and shattered. There was no impact, or previous
damage. I opened my driver door to get in and then it crumbled.

December 30, 2025NHTSA CAMPAIGN NUMBER: 11707709
COMPONENT: VISIBILITY/WIPER
**NHTSA ID Number:** 11707709
**Incident Date:** December 29, 2025
**Consumer Location:** PARLIN, NJ
**Vehicle Identification Number:** 5N1BT3BB6SC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
While my vehicle was parked in a parking lot my back window shattered for no reason.

58.     Consumers similarly complained about the Defect in Class Vehicles on various
online forums and social media platforms. Not only does NNA monitor these websites as well, but
many of these posts either tag NNA or mention having reached out to NNA and/or its authorized
dealerships about the Defect.

59.     The following complaints are a sampling of the many complaints:





# NISSAN WINDOW EXPLODED !

21 - 40 of 58 Posts

◀ 1 **2** 3 ▶



#21 · May 10, 2022

Just this morning my daughter and Son in-law we're sitting at a red light and the back window of my 2021 Rogue shattered. It looks like what everyone describe (two holes on either side). They called the police thinking someone threw something at the car. They check everything and found nothing. There was no impact, no foreign object found. People around only heard the shattering of the glass and stated they saw nothing or no one..

Registered 🇺🇸

Joined May 10, 2022
1 Posts

🔍 Reply  🔲 Quote  👍 Like          🔖 Save  ⅋ Share



**NISSAN ROGUE · Join**

· August 4 · 🌐

I had a 2023 Rogue and bought a 2025 45 days ago. Yesterday the rear window blew out of NOWHERE! I'd like to know if anyone else has experienced this? Nothing hit the window, nothing happened. The car was parked in my driveway and the window exploded with my baby in the back seat!





60.     Additionally, NNA should have learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to NNA.

61.     Despite its knowledge of the Defect in the Class Vehicles, NNA actively concealed the existence and nature of the defect from Plaintiffs and Class Members, including by consistently denying warranty coverage and falsely blaming the rear window failures on impacts with objects.

## TOLLING OF STATUTES OF LIMITATIONS

62.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault of their own or lack of diligence, Plaintiff and Class Members were deceived regarding

the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiff and Class Members.

63.     Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

64.     At all times, Defendant is and was under a continuous duty to disclose the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence of the Defect.

65.     Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

66.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

67.     This action is brought and may be maintained as a class action, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rule of Civil Procedure.

68.     The Nationwide Class is defined as follows:

> **Class**: All persons in the United States who bought or leased, other than for resale, any 2021-2025 Nissan Rogue vehicle ("Class Vehicles").

69.     In addition, or in the alternative, the State Subclass is defined as follows:

**Georgia Subclass**

All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Georgia.

70. Excluded from the Class are NNA, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

71. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, as such information is in the sole possession of NNA and is obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least thousands of Class Vehicles have been sold and leased nationwide and in the state where Plaintiff resides. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by NNA in connection with its sales and leases of Class Vehicles.

72. **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.    whether NNA engaged in the conduct alleged herein;

    b.    whether Class Vehicles are defective;

    c.    whether NNA placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

    d.    whether NNA knew or should have known of the Defect, and if so, for how long;

    e.    when NNA became aware of the Defect in the Class Vehicles;

f.     whether NNA knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.     whether NNA's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.     whether Plaintiff and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.     whether Plaintiff and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.     whether Plaintiff and Class Members are entitled to damages, including punitive damages, as a result of NNA's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.     whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

73.     **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiff and Class Members were economically injured in the same manner by NNA's uniform course of conduct alleged herein. Plaintiff and Class Members have the same or similar claims against NNA relating to the conduct alleged herein, and the same conduct on the part of NNA gives rise to all the claims for relief.

74.     **Adequacy**: Plaintiff is an adequate representative of the Class, and her interests do not conflict with those of any other Class Member. Plaintiff has retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

75.     **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of

individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

76. **Injunctive Relief**: NNA has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of the Implied Warranty of Merchantability**
**Plaintiff Individually and on Behalf of the State Subclasses**

77. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

78. The NNA is a "merchant" as defined under the Uniform Commercial Code ("UCC").

79. The Class Vehicles are "goods" as defined under the UCC.

80. A warranty that the Class Vehicles were in merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class Vehicles. NNA impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

81. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used, and fall

short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the rear windows are prone to suddenly explode. The Defect renders the Class Vehicles unmerchantable.

82.     NNA was provided notice of the issues complained of herein by numerous complaints it received about them.

83.     Plaintiff and the other Class members have had sufficient direct dealings with either NNA or its agents (e.g., dealerships and technical support) to establish privity of contract between NNA on one hand, and Plaintiff and each of the Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class members are intended third-party beneficiaries of contracts between NNA and its dealers (who are NNA's agents), and specifically, of NNA's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

84.     As a direct and proximate result of the breach of said warranties, Plaintiff and Class members were injured, and are entitled to damages.

<u>**COUNT II**</u>
**Breach of Express Warranty**
**Plaintiff Individually and on Behalf of the State Subclasses**

85.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

86.     NNA is a "merchant" as defined under the UCC.

87.     The Class Vehicles are "goods" as defined under the UCC.

88.     NNA expressly warranted that the Vehicles were of high quality and, at a minimum, would function properly. NNA specifically warranted attributes and qualities of the Class Vehicles,

including their safety, reliability, and durability as detailed above, including with respect to performance, quality, operability, convenience, and safety.

89.     NNA also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the applicable warranty periods.

90.     NNA breached its warranties by selling to Plaintiff and the Class members Vehicles with defective rear windows, which are not of high quality, and which are predisposed to suddenly explode, presenting an unreasonable safety risk. NNA also breached its warranty by failing to provide and cover adequate repairs when Plaintiff and Class members presented their Vehicles to authorized NNA dealers following manifestation of the Defect.

91.     These warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Vehicles equipped with defective rear windows.

92.     Plaintiff and Class members experienced the Defect within the warranty period. Despite the existence of express warranties (including but not limited to Nissan's New Vehicle Limited Warranty), NNA failed to inform Plaintiff and Class members that the Vehicles are defective and failed to fix or eliminate the Defect.

93.     As a result of NNA's actions, Plaintiff and Class members have suffered economic damages including, but not limited to, costly repairs and replacements, loss of Vehicle use, diminished value, substantial loss in value and resale value of the Vehicles, and other related damages.

94.     NNA was provided notice of the issues complained of herein by numerous complaints filed against it, including the instant lawsuit, within a reasonable amount of time.

95.     Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of NNA's conduct described herein.

## COUNT III

**Unjust Enrichment**
**In the Alternative to All Other Claims**
**Plaintiff Individually and on Behalf of the State Subclasses**

96.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

97.     Plaintiff brings this claim, under the laws Georgia individually and on behalf of the Georgia State Subclasses.

98.     This claim is pleaded in the alternative to the other claims set forth herein.

99.     As the intended and expected result of its conscious wrongdoing, NNA has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

100.     In particular, the value of the Class Vehicles was artificially inflated by NNA's concealment of the Defect, and Plaintiff and Class Members overpaid for the cars and have been forced to pay other costs.

101.     As a result of its wrongful acts, concealments, and omissions of the Defect in its Class Vehicles, as set forth above, NNA charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to NNA's authorized distributors and dealers, which are in NNA's control and from whom NNA receives monetary benefits.

102.     Moreover, NNA continues to profit from its ongoing wrongful behavior by denying the nature and existence of the Defect to Plaintiff and Class Members during the duration of the Warranties, refusing to honor the Warranties, and selling replacement parts to Plaintiff and the Class Members.

103.    NNA has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiff and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that NNA had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

104.    Plaintiff and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from NNA's conduct.

105.    NNA has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

106.    Equity and good conscience militate against permitting NNA to retain these profits and benefits from its wrongful conduct.

107.    As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

108.    Plaintiff does not seek restitution under their Unjust Enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

109.    Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT IV

**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.***
**Plaintiff, Individually**

110.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

111.    Plaintiff brings this cause of action individually.

112.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

113.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

114.    NNA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

115.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

116.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

117.    In its Limited Warranty, NNA expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

118.    NNA's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

119.    With respect to Plaintiff's purchase of her Class Vehicle, the terms of NNA's written warranty and implied warranty became part of the basis of the bargain between NNA, on the one hand, and Plaintiff, on the other.

120. NNA breached the implied warranty of merchantability. Without limitation, the Class Vehicles the rear windows in Class Vehicles are not sufficiently robust and prone to explode, as described above, and which thus render the Class Vehicles unmerchantable.

121. NNA breached its express Limited Warranty by refusing to repair rear window failures in the Class Vehicles under the terms of the Limited Warranty. Plaintiff presented her vehicle for repair and NNA refused to cover it.

122. Plaintiff, individually and on behalf of the members of the proposed Class, notified NNA of the Defect and its corresponding breach of warranty, through a notice letter sent on January 21, 2026.

123. NNA was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. NNA has not remedied the breach.

124. Further, NNA has refused to provide an adequate warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile

125. At the time of sale or lease of each Class Vehicle, NNA knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and futile, and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford NNA a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

126. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

127. As a direct and proximate result of NNA's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff has sustained damages in an amount to be determined at trial.

128.    Plaintiff seeks all damages permitted by law, including the diminution in value of her vehicle, in an amount to be proven at trial.

## COUNT V

**Fraud by Omission or Fraudulent Concealment
Plaintiff, Individually and on Behalf of the Nationwide Class,
Or, in the Alternative, on Behalf of the State Subclass**

129.    Plaintiff realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

130.    Plaintiff brings this cause of action on behalf of herself and the Nationwide Class against Defendant as there are no true conflicts among the states' laws of fraudulent concealment/omission. Defendant is liable for both fraudulent concealment and non-disclosure, including the resultant fraudulent inducement. *See, e.g.*, Restatement (Second) Torts §§ 550-51 (1977). In the alternative, Plaintiff brings this claim on behalf of the State Subclass, against Defendant.

131.    NNA distributed and sold the Class Vehicles in all 50 states. NNA also drafted, distributed, and disseminated the same advertising materials in all 50 states, including on the website it maintains to advertise the Class Vehicles.  Those materials omitted any mention of the Defect and its associated safety concerns.

132.    NNA also drafted the Monroney Stickers which were affixed to Class Vehicles and contained other safety information about the vehicles but failed to disclose the Defect and its associated safety concerns.

133.    NNA knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

134.    Defendant concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

135.    Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

a. Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b. The omitted facts were material because they directly impact the safety of the Class Vehicles;

c. Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

d. Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e. Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

136. NNA also had a statutory duty to disclose known safety defects to consumers and NHTSA under federal motor vehicle safety law.

137. The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a Class Vehicle's rear window is defective and can suddenly explode is a material safety concern. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

138. Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

139. Defendant continued to conceal the defective nature of the Class Vehicles even after Plaintiff and Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

140.     As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

141.     Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, hereby requests that this Court enter an Order against NNA providing for the following:

A.     Certification of the proposed Class, appointment of Plaintiff and their counsel to represent the Class, and provision of notice to the Class;

B.     An order permanently enjoining NNA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint

C.     Injunctive relief in the form of a recall or free replacement/repair program;

D.     Equitable relief, including in the form of buyback of the Class Vehicles;

E.     Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.     An Order requiring NNA to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G.     An award of reasonable attorneys' fees and costs as permitted by law; and

H.     Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: January 23, 2026

Respectfully submitted,

*/s/ John Spragens*
John Spragens (TN Bar No. 31445)
**SPRAGENS LAW PLC**
915 Rep. John Lewis Way S., Suite 100
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Local Counsel for Plaintiffs and the Proposed Class*

Timothy N. Mathews (*pro hac vice forthcoming*)
Alex M. Kashurba (*pro hac vice forthcoming*)
**CHIMICLES SCHWARTZ KRINER**
 **& DONALDSON SMITH LLP**
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041
Tel: (610) 642-8500
tnm@chimicles.com
amk@chimicles.com

*Counsel for Plaintiff and the Proposed Putative Class
 Members*